Good morning, Your Honor. May it please the Court, my name is Richard Wooster, Man Johnson, Wooster McLaughlin, Tacoma, Washington, representing Debbie L. Johnson, the appellant in this matter. This is an appeal from a grant of summary judgment denying Mr. Johnson's claims of racial discrimination and breach of contract in violation of 42 U.S.C. section 1981, in which he asserts that the contract rights afforded to non-African American employees by the Boys and Girls Club were handled differently than the situation with him. I'd like to reserve a minute and a half for rebuttal. Essentially, it is our position that summary judgment was inappropriate in this case. The standard of review is de novo review, and all factual inferences need to be interpreted most favorably in favor of Mr. Johnson. And in this situation, Mr. Johnson... You got that, so just jump to where they weren't. Give us the tribal issues here. Okay. Tribal issues were, what was the motivation for terminating Mr. Johnson? We had promises of specific treatment in specific situations that certain steps would be followed if, in fact, there was a performance issue. The record indicates that there was an effort by Mr. Johnson's manager, Gene Anderson, and Rick Gild, who was the chief operations officer, to paper Mr. Johnson's file on the date of the termination by creating documents that reflected counseling sessions that had occurred. Now, the Boys and Girls Club policy specified that when there was a performance issue for unsatisfactory performance, and this is at page 193 in the record, that there is a detailed process that is going to be followed. You've got two things going on there. You've got a clearly stated at-will provision in the handbook and Mr. Johnson's acknowledgement that he understood this at-will status. And then you have what I would call an implied promise to provide progressive discipline. So you've got those, and we have to look at all of that and decide, essentially, as a matter of law, whether that progressive discipline changes, alters the employment, right? But with the exception of I don't believe that Mr. Johnson has acknowledged that he understood the at-will provision after he had completed his initial period of employment, because the language in the handbook... Do you agree it's clearly stated in the handbook, though? I agree that the disclaimer is prominently displayed. However, I do not agree that it is clearly stated in consideration of conduct of the parties, in consideration of the other conflicting language that's contained within the manual. And specifically, the conflicting language says these steps will apply. Additionally, you've got the memorandum in there. It's an email that reflects the progressive discipline steps are being applied for a non-white employee. I guess I think your strongest argument here has to do with his wrongful termination based on race discrimination. And what I would like for you to tell me, and you started to talk about the papering. There's also indications in the record over that there were requests and discovery, and it wasn't until much later that finally certain documents were produced. And my understanding is that the district judge found on that that he hadn't made the prima facie case, correct? And so never got to the next, you know, allowing them to justify it, and never got to pretext, right? That's in essence what, yes. So if you make the prima facie case on that, what is the evidence in the record on pretext? Well, first we did make the prima facie case. Well, let's just for right now assume, let's say, If I'm saying I think that's your strongest argument of the ones that you. With the pretext is, one, they set unreasonable standards of performance. They're criticizing him for not having the program up and running. This is done two days after he had access to the bot lab. He continued to do his duties as the athletic director. He was assigned his duties as the athletic director. The bot lab did not open until mid-October, I believe October 14th. But my understanding of the pretext is what I want are the things in the record that show that the reasons they gave for why they fired him were really, that they were really a cover-up for the race. What are the things in the evidence that show that? The things in the evidence that show that are that they were attempting to paper his trail to indicate that they had given him these warnings when, in fact, that had not been done. They were being told to make sure that the fonts match in these things, documents that they were putting in. Say that again? They were told in the e-mail from Rick Gild, the chief operations officer, make sure the fonts match and include lack of recruiting. We know that he was not, you know, the lack of recruiting is false because the person that he had recruited was the person that they put in to replace him, Mr. Willen. The fact that this document appears that he was supposedly given in September prior to the bot lab even being open, prior to him even being removed of his duties of running the day camp and the athletic director duties, that he had been counseled, and this document didn't appear until well into the process. Isn't all that just showing they might have had unreasonable expectations? Well, I think... Where's the racial discrimination? The racial discrimination is in, you know, comments by Mr. Anderson, I don't understand you people, I don't understand African Americans, sending around a photograph of an African American woman saying that this is not what we're all about, to the other people in the organization. That's indication of some bias. We have the issue of Mr. Frannich saying, you know, he lost the skill tech discs, and Mr. Johnson saying, I didn't lose them, you never gave them to me, you kept promising to give them to me, and I had to create my own criteria. You've got these false reasons being advanced for his termination. And these are for a jury to sort out. These are issues that are not appropriate for summary judgment. Mr. Johnson claimed that he didn't have rules and regulations, yet people who were in the court or in the computer lab said that he did, and that they were enforced and they were posted on the wall. The fact that he had 175 kids out of 220 involved in his program. These are all things that suggest that discrimination was motivating their behavior, and the fact that they were creating these documents, that he was denied. He attempted to get his personnel file the next day, and he was put off saying, you know, you can't have your personnel file, you have to come back later. And he insisted that, no, I want to see my personnel file now. And then these documents that he was supposedly given. Do you want to save your time for rebuttal here? Yes, I would. Okay. Are the members of the club racially mixed? The members of the club is very diverse, yes. Very diverse, very racially mixed. More so in the other clubs than this club. This club has a number of children of color, but it's much less so than the other clubs. How many members in the club? Several thousand. And it's Puget Sound, South Puget Sound clubs, so we've got six or seven different clubs in the area and several hundred members at each club. Thank you. I'll give you a minute and a half for rebuttal. May it please the Court. Jerry Sale here for the Appellee Boys and Girls Clubs of South Puget Sound. There are four issues. Essentially one has to do with failure to promote. That wasn't addressed. I think that's relatively easily disposed of. It's a position that Mr. Johnson did not apply for. What Mr. Worcester was talking about was the termination and the basis for that. And there are three, essentially, that he alleges. One of them is race discrimination. One of them is retaliation. And the last is failure to comply with the terms of the handbook if those apply. And do you address questions as to both of those? I think I'd like to start out with what Judge Callahan noted was the strongest argument, and that was that there was race discrimination. I'm not speaking for the panel. I'm just saying, then, looking at it, that's the one that's giving me the most trouble in terms of that. If, let's just say, if, I mean, obviously making the prima facie case is not that hard. And if, let's just say, if we assume, I think his prima facie case was, okay, he gets terminated, and then he also puts in evidence that a Caucasian gets hired over an African American that are similarly situated to replace him. Correct. Then that's the way I understood the gist of his prima facie case. And then there are justifications made by the Boys and Girls Club about his performance. And the way I understood the body of pretext, the things that I was picking out, were there were some comments that were made over I don't understand your culture, I don't understand your people, this, that, and the other. There was a picture that was put up. There was some testimony about handling the children differently. Then there was the personnel issue in terms of while the company justified saying, well, we have to get everything, draw it from the out, you know, draw things from the, get them into the main personnel file. I believe Mr. Johnson testifies. He did, he was talked to about some of the problems of his work, but he denies getting the memos. And then there's the discovery issue about this memo coming up later. So that's why, why isn't that enough to go to a jury? I think there are a couple of reasons. Number one, they would have, there has to be some indication, I think, that race discrimination is an issue here. Probably something more than just that there are fact disputes as to those individual issues. I don't think. I agree with you on that. I think you take the whole thing. You put it all together with all inferences to the plaintiff. Absolutely. And I don't think there is any indication to, that any of this relates to race in any way. The comments by Mr. Anderson don't actually show a discriminatory animus. They may show a lack of perspicacity or they may show that he doesn't understand the culture, but that doesn't show that he discriminated on that basis. Nor was he the only one making the decision. John Franish was involved in the decision as well. As is indicated in the record, John Franish hired an African-American for a bot lab following Mr. Johnson's dismissal, but not for the Gagne bot lab. It was for the L. Davies and other facilities bot lab. There is no indication in regard to that of any discriminatory animus by these people involved. I think, in fact, he relies more upon the circumstantial evidence approach, that this is mere pretext by showing things in regard to whether or not the memos were in his file at the time, whether or not this reference to font, which I think if you take a look at the memo, refers only to a collaboration by a number of people on a termination letter and whether or not the font in that termination letter that's been worked on by more than one person is consistent. Well, and that's your spin on it. Sure. And he has another spin. And he does. So I essentially have to take his spin on some of these to decide, put them all together and let them come up with it. I understand that. I don't think that meets the standard. But here's what I think is the important consideration in all of this. In the Ninth Circuit and other jurisdictions as well, there is a strong inference, and I'm quoting that term, a strong inference that there is no discrimination if the people who have hired the person are also the same people who have fired the person within a short period of time. There's the Bradley case in the Ninth Circuit. There's also the Coleman case in the Ninth Circuit. And the Bradley case cites the Lowe v. J.B. Hunt case, which is out of the Fourth Circuit, I believe. Judge Trott said in quoting yet another case, this one's out of the, he's quoting Proud v. Stone, which is out of the Fourth Circuit. I think the J.B. Hunt case is actually out of the Seventh Circuit. It says, One is quickly drawn to the realization that claims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes, thereby incurring the psychological cost of associating with them only to fire them once they are on the job. And then he goes on in his own voice, Judge Trott, to say, We therefore hold that where the same actor is responsible for both the hiring and firing of a discrimination plaintiff and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive. And in that Bradley case, there was no rebuttal to that, and as a result, summary judgment was upheld. But Hunt has had a play here because he started in 95. Yes. He started in 95. Anderson was his supervisor after a certain period of time. There's nothing to indicate that there was any problems between them. I mean, Johnson was... Well, I guess the other thing is it seems like he did really well as athletic director. The problem started at Bott. Correct. And I think that's exactly the problem. As athletic director, he was very capable. As Bott, he was not. And therefore, although he was promoted to that position, and he was promoted to that position by Anderson and Franich together. It was their decision. And they promoted him, and he'd had pay raises leading up to that time. They promoted him to that position, and six months later, they pulled the plug. There is a strong inference that under those circumstances, there is no racial discrimination involved. And I think that's perfectly clear. Why wouldn't there be some conflict between them before that time? Or why would they have promoted him to Bott if they were intending only to fire him because of his race? He was exactly the same race on the day that they promoted him as he was on the day they terminated him. There is no basis to overcome that strong inference. And that, I think, alone is enough in this case to prevail on that question. So although there are fact questions, and I think you have a great deal of problem finding in those fact questions, whether or not there's any discrimination involved. But although there are fact questions as to how those documents may have been created or whether he was in fact doing a good job or whether he was in fact in the lab when they thought he wasn't in the lab and whether or not he was concentrating his efforts on the Bott lab as opposed to concentrating his efforts on the athletic part of the program. Although those fact questions are raised, they do not overcome in any way or even come close to overcoming the strong inference that there is no discrimination when these same people hired him and a short time later fired him for what the record shows was his reluctance to leave the athletic program and to develop for all ability levels the computer program in the Bott lab. Are you suggesting that in racial discrimination matters, all racial matters, that they be decided by inferences? Oh, certainly not. That's the impression I got in your last three minutes of presentation. No, you used the word all. I'm simply reciting to the court exactly what the holding was in Bradley. What Bradley says is that inference arises, and if that inference arises and it's not rebutted, it's appropriate for summary judgment in those circumstances. Those are the circumstances we have here. I certainly wouldn't say that you decide all cases in favor of defendants on the basis of inferences. In fact, as you well know, many of the inferences, most of the inferences, go to the plaintiffs under the burden-shifting of McDonnell Douglas and so on. But in this case, the strong inference is a good inference. Where do inferences come from? Well, in this case. That's what worries me about inference. Sure. No, in this case, it comes from common sense. I mean in. . . Common sense. Yes, don't you think? Well, I have to appeal to the common sense of the bench, certainly. And I think that's what the bench proposes to use. But in this case, isn't it common sense? Doesn't it defeat common sense? Doesn't it defeat rationality to propose that Mr. . . . Common sense led to racial discrimination. No, Your Honor. I don't think so. I'm not buying this program here. Back in the old days, it was, quote, based upon, quote, common sense. This is not the argument I'm making, Your Honor. The argument I'm making is that these gentlemen hired him to be bot lab manager. And they knew the day they did that that he was black, that he was African American. Six months later, and there are things in the records which support why they did this. Six months later, they terminated him from that position. How does it make any sense in the world that that would be based upon race discrimination? And that's what Bradley says. That's what Coleman says. That's what Lowe v. J.B. Hunt says. And I think that's what the court properly said in this case. Unfortunately, I've run out of time and any ability to address the other issues. Thank you very much. All right. Let me just, before you sit down, do either of the judges have any additional questions? All right. Thank you. And your time has expired. Thank you, Your Honor. I'd address Judge Callahan's comment that this was not a hire case. Mr. Johnson did not come in from the outside. But is there any material difference between hiring, the circumstances in the cases where someone is hired and then shortly thereafter fired, and promoting and then shortly thereafter firing? Isn't the promotion the functional equivalent? I would say no, not in this case. Because here you have somebody in the organization. You are putting him into the position. He is entitled to certain protections under the manual, I would say. Swanson v. Liquid Air indicates that the manual provisions aren't illusory. They've got to be followed. And then he is not in a probationary employment under the promises of the manual. And you have Mr. Johnson acknowledging, or rather Mr. Anderson acknowledging at 203 in the record that, you know, let's do this before the six-month probationary period is out. So they can put him into a position. He created a nationally recognized athletic program at that branch. He was not vulnerable then. They move him into this new position that he applied for, and then they boot him out before six months is up on a false pretense. So you suggest they put him into a position where they could have a probationary period so that they would not have to follow the procedures they would have had to follow? I think that's what they thought they had done. But they were wrong. What's in the record that supports that? In the record that supports that is exhibit 193 in the record that describes the probationary process dealing with unsatisfactory, and then exhibit excerpts of record 203. Is that in the handbook? That is in the handbook. Okay. Under the definition, and it says probationary employees are fully at will where the nonprobationary employees have the procedure that applies to them. And so by moving them into that position and also the timing on the documents, the creation of the documents, things of that nature, I would submit that there are questions, in fact, that are for the jury to sort out as to what was motivating these individuals in view of his strong track record previously and the contradictions in the record. All right. Thank both of you for your argument. This matter will now stand submitted. The court's going to just take a short recess of about five minutes, and then we'll resume oral argument. All rise. This court stands in recess.
judges: Ferguson, Callahan, Bolton